1  DAVID J. STOCK (SBN 85655)
   JON A. HEABERLIN (SBN 199810)
2  MICHELLE C. TING (SBN 228963)
   **RANKIN, LANDSNESS, LAHDE,**
3  **SERVERIAN & STOCK**
   96 North Third Street, Suite 500
4  San Jose, California  95112
   Telephone:  (408) 293-0463
5  Facsimile:  (408) 293-9514

6  Attorneys for Defendants
   LEWIS FAMILY ENTERPRISES, INC. and
7  STEVEN ROBERT LEWIS

8                  UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10 FORD MOTOR CREDIT COMPANY,        )   Case No.:  C 07-03301 RS
   LLC, a Delaware Limited Liability )
11 Company,                          )   **COUNTERCLAIM; DEMAND FOR JURY**
                                     )   **TRIAL**
12              Plaintiff,           )
                                     )
13 vs.                               )
                                     )
14 LEWIS FAMILY ENTERPRISES,         )
   INC., dba BOB LEWIS LINCOLN       )
15 MERCURY, a California corporation,)
   and STEVEN ROBERT LEWIS, an       )
16 individual,                       )
                                     )
17              Defendants.          )
                                     )
18 _____  )
                                     )
19 LEWIS FAMILY ENTERPRISES,         )
   INC., dba BOB LEWIS LINCOLN       )
20 MERCURY, a California corporation,)
   and STEVEN ROBERT LEWIS, an       )
21 individual,                       )
                                     )
22              Counterclaimants,    )
                                     )
23 vs.                               )
                                     )
24 FORD MOTOR CREDIT COMPANY,        )
   LLC, a Delaware Limited Liability )
25 Company; FORD MOTOR COMPANY,      )
   a Delaware corporation; CAPITOL   )
26 EXPRESSWAY FORD, INC., a          )
   Delaware corporation; and DOES 1  )
27 through 10, inclusive,            )
                                     )
28              Counterdefendants.   )
   _____  )

                              1
          **COUNTERCLAIM; DEMAND FOR JURY TRIAL**

1    Counterclaimants LEWIS FAMILY ENTERPRISES, INC., dba BOB LEWIS

2    LINCOLN MERCURY, and STEVEN ROBERT LEWIS (collectively, "Counterclaimants")

3    allege as follows:

4                              **JURISDICTION AND VENUE**

5    1.    The jurisdiction of this court over the subject matter of this action is

6    predicated on diversity of citizenship as this civil action is between citizens of different

7    states under 28 U.S.C. § 1332.  Additionally, the amount in controversy exceeds the sum

8    of or value of $75,000, exclusive of interests and costs, in accordance with 28 U.S.C. §

9    1332.

10    2.    Venue is proper in the Northern District of California under 28 U.S.C. § 1391

11    because a substantial part of the events or omissions giving rise to the claims asserted

12    herein occurred in this judicial district.

13                                       **PARTIES**

14    3.    Counterdefendant FORD MOTOR COMPANY ("Ford") is a Delaware

15    corporation headquartered in Dearborn, Michigan.  In North America, Ford distributes and

16    sells its motor vehicles through a dealer franchise network.  Ford's automotive brands

17    include Lincoln and Mercury.

18    4.    Ford operates a Dealer Development Program, which has the purpose of

19    facilitating the establishment of independent franchised dealers by allowing a participating

20    dealership (known as a "Dealer Development Dealership") to become the sole owner of a

21    Ford and/or Lincoln Mercury dealership corporation over a period of time.  Under the

22    Dealer Development Program, Ford funds up to ninety percent (90%) of the investment

23    capital needed to purchase a Ford dealership, and supplies and finances the majority of

24    Ford vehicles and parts to Dealer Development Dealerships.  Over time, the operator of a

25    Dealer Development Dealership purchases equity from Ford using the operator's share of

26    the net profits from the dealership.  The objective of the Dealer Development Program is

27    to allow the operator of a Dealer Development Dealership to repay Ford so that the

28    operator is ultimately able to own one hundred percent (100%) of the dealership.  Through

1  the Dealer Development Program, Ford holds ownership interests in certain Ford Lincoln

2  Mercury dealerships.

3      5.      Counterdefendant FORD MOTOR CREDIT COMPANY, LLC ("Ford Credit")

4  is a Delaware limited liability company headquartered in Dearborn, Michigan.  Ford Credit

5  is a wholly owned subsidiary of Ford.  Ford Credit offers wholesale automotive financing to

6  and through Ford's automotive dealers, including the making of loans to Ford dealers to

7  finance the purchase of vehicle inventory (i.e., floorplan financing).  The predominate

8  share of Ford Credit's business consists of financing Ford vehicles and supporting Ford

9  dealers.

10      6.      Counterdefendant CAPITOL EXPRESSWAY FORD, INC. ("Capitol Ford") is

11  a Delaware corporation with its principal place of business at 919 W. Capitol Expressway,

12  San Jose, County of Santa Clara, California.  Capitol Ford is an authorized Ford Lincoln

13  Mercury dealer, and is a Dealer Development Dealership in which Ford has an ownership

14  interest.

15      7.      Counterclaimant LEWIS FAMILY ENTERPRISES, INC. (the "Corporation"),

16  dba BOB LEWIS LINCOLN MERCURY, is a California corporation, with its principal place

17  of business located at 911 Capitol Expressway Auto Mall, San Jose, County of Santa

18  Clara, California.  During the period from December 2003 to September 2007, the

19  Corporation owned and operated a Ford Lincoln Mercury dealership in San Jose,

20  California, under the fictitious business name of BOB LEWIS LINCOLN MERCURY (the

21  "Bob Lewis dealership").  The Bob Lewis dealership is not a Dealer Development

22  Dealership.

23      8.      Counterclaimant STEVEN ROBERT LEWIS ("Lewis") is an individual who is

24  a citizen of the State of California and a resident of Santa Clara County, California.  Lewis

25  is the president of the Corporation.

26      9.      Counterclaimants do not presently know the true names and capacities of

27  the counterdefendants sued herein as DOES 1 through 10, inclusive.  Counterclaimants

28  will seek leave of court to amend this counterclaim to allege said counterdefendants' true

1 names and capacities as soon as ascertained by Counterclaimants.

2 **GENERAL ALLEGATIONS**

3     10.    In or about December 2003, the Corporation executed Lincoln and Mercury

4 Sales and Service Agreements with Ford to establish the Corporation as an authorized

5 dealer of Ford products and Ford Lincoln Mercury vehicles.  Under the terms of these

6 agreements, Ford and the Corporation covenanted not to engage in deceptive,

7 misleading, or confusing business practices.

8     11.    Between December 2003 and February 2004, the Corporation secured

9 inventory financing from Ford Credit for the acquisition of new and used motor vehicles for

10 sale and lease by the Bob Lewis dealership.  The Corporation also obtained a capital loan

11 from Ford Credit in the principal amount of $800,000 to purchase dealership assets.

12     12.    The aforementioned loans were secured by the equipment, furnishings,

13 goods, motor vehicles, service parts, accessories, accounts, instruments, chattel paper,

14 contract rights, and documents of the Corporation/Bob Lewis dealership.  Lewis personally

15 guaranteed the full repayment of the Corporation's obligations to Ford Credit.

16     **A.    FORD'S DEALERSHIP CONSOLIDATION/REDUCTION PROGRAM**

17     13.    In late August 2006, Ford commenced a Lincoln Mercury dealership

18 consolidation/reduction program aimed at improving the fiscal health of its dealerships.

19 Under the program, Ford offered an exit process or strategy to existing Lincoln Mercury

20 dealers, including the Corporation.

21     14.    In Fall 2006, Joe Kerley Lincoln Mercury, a Ford dealership located in San

22 Jose, California, voluntarily resigned its sales and service agreement (i.e., franchise) with

23 Ford under the Lincoln Mercury dealership consolidation/reduction program.

24     15.    The Corporation and Sunnyvale Lincoln Mercury, a Lincoln Mercury

25 dealership located in Sunnyvale, California, agreed to participate in the consolidation of

26 the San Jose multipoints or San Jose regional market for Lincoln Mercury dealers.

27 Accordingly, the Corporation proposed to operate a consolidated company dealership

28 whereby the Corporation agreed to acquire a portion of the Lincoln Ford market assigned

1   to Joe Kerley Lincoln Mercury, and agreed to acquire a portion of Joe Kerley Lincoln

2   Mercury's 2007 new model inventory.  The Corporation's proposal for a consolidated

3   dealership was accepted by Ford in or about November 2006.

4        16.     At no time prior to or during the consolidation process did Ford indicate to

5   Counterclaimants that the Corporation's operation of a consolidated company dealership

6   would foreclose or preclude the Corporation from electing or availing itself of the Lincoln

7   Mercury dealership consolidation/reduction program or the exit process offered under this

8   program at a later date.

9                     **B.     THE RELOCATION OF THE BOB LEWIS DEALERSHIP**

10       17.     Prior to April 15, 2007, the Bob Lewis dealership was located at 909 West

11  Capitol Expressway Auto Mall, San Jose, County of Santa Clara, California.  The

12  Corporation subleased the 909 West Capitol Expressway Auto Mall premises from Ford

13  Leasing Development Company, a Delaware corporation and an affiliate of Ford.

14       18.     On or about November 29, 2006, the Corporation requested authority from

15  Ford to relocate the Bob Lewis dealership from 909 West Capitol Expressway Auto Mall to

16  911 Capitol Expressway Auto Mall, San Jose, County of Santa Clara, California, as the

17  Corporation had procured a candidate to assume its obligation on the Ford sublease.

18       19.     On or about March 20, 2007, Ford approved the Corporation's request to

19  relocate the Bob Lewis dealership conditioned on the Corporation's renovation of 911

20  Capitol Expressway to incorporate Lincoln and Mercury Gallery Design elements (i.e., to

21  display the proper Lincoln Mercury signage).  The Corporation would bear the cost of

22  ordering and installing the new signage at an estimated cost of between $10,000 to

23  $15,000, and at a cost of no more than $30,000.

24       20.     Shortly thereafter, the Corporation assigned its Ford sublease to Almaden,

25  Inc., a California corporation, operated and owned, in part, by Shaun Del Grande.

26  Accordingly, in or about April 2007, the Corporation and Ford Leasing Development

27  Company terminated the 909 West Capitol Expressway Auto Mall sublease pursuant to

28  the Sublease Termination Agreement executed by and between the Corporation and Ford

1   Leasing Development Company.  The Corporation thereafter commenced its operation of

2   the Bob Lewis dealership at 911 Capitol Expressway Auto Mall.

3              **C.      THE CORPORATION'S SALES OUT OF TRUST CONDITION**

4              21.     On or about June 5, 2007, Lewis telephoned Phil Ward ("Mr. Ward"), a

5   Territory Sales Manager for Ford Credit, to advise the latter that a sales out of trust

6   ("SOT") condition had occurred at the Bob Lewis dealership.  The SOT condition resulted

7   from the Corporation's failure (beginning in or about February 2007) to apply the proceeds

8   from the sale of various Lincoln Mercury vehicles to the repayment of the financing

9   provided by Ford Credit to the Corporation for the latter's initial acquisition of the vehicles

10  sold.  Although the SOT condition had continued for a four (4) month period preceding

11  June 2007, Ford Credit permitted the Corporation to continue its operations (i.e., the sale

12  of Lincoln Mercury vehicles).  (Significantly, for the four (4) months preceding June 5,

13  2007, Ford Credit failed to conduct the required monthly flooring audit, and was therefore,

14  unaware of the SOT condition until so advised by Lewis.)

15             22.     On or about that same day (June 5, 2007), Ford Credit temporarily withdrew

16  the line of wholesale credit for the Bob Lewis dealership.  As a result, on or about June 7,

17  2007, Ford placed a "vehicle order hold" effectively precluding the Bob Lewis dealership

18  from ordering new vehicle inventory, excepting those motor vehicles in-plant and in-transit.

19             23.     On or about June 6, 2007, Steve Boldvich, a Center Operations Manager –

20  Status forFord Credit, wrote to the Corporation and to Lewis demanding the immediate

21  payment of the sum total of $969,523.55, representing the balance of the capital loan

22  owed by the Corporation ($268,329.39) and the outstanding balance owed by the

23  Corporation to Ford Credit on the SOT vehicles or the vehicles which had been sold out of

24  trust ($701,194.16).

25             24.     However, on or about June 7, 2007, Lewis met with Mr. Ward of Ford Credit

26  to discuss the SOT condition.  Mr. Ward informed Lewis that Ford Credit would continue

27  to provide the Corporation with vehicle financing under specific guidelines to ensure the

28  continued operation of the Bob Lewis dealership.  The Corporation proceeded to work

1  with Ford Credit to repay and reduce the SOT amount or the outstanding inventory

2  financing amount owed by the Corporation to Ford Credit.

3       25.    On or about that same date (June 7, 2007), Lewis telephoned Hal (H.E.)

4  Dewsnap ("Mr. Dewsnap"), a Regional Sales Manger/General Manager for Ford, to

5  discuss the SOT condition.  Lewis informed Mr. Dewsnap that the Corporation did not

6  have the funds to immediately pay the sum demanded by Ford Credit.

7       **D.    THE SALE OF THE BOB LEWIS DEALERSHIP**

8       26.    On or about June 8, 2007, the Corporation (i.e., Lewis) was contacted by

9  Philip A. Campisi, a Market Representation Manager for Ford, concerning the facility

10  upgrades to 911 Capitol Expressway Auto Mall or the location of the Bob Lewis

11  dealership.  For the first time, Ford informed the Corporation that in addition to the

12  signage upgrade, a facility renovation would also be necessary and mandatory.  Ford

13  indicated to Lewis that the Corporation would be required to bear the full $250,000 to

14  $500,000 expense of such an upgrade.

15       27.    Due to the Corporation's inability to bear the expense of the facility

16  renovation newly required by Ford, Lewis contacted P.J. (Patrick) Sheehan ("Mr.

17  Sheehan"), a Regional Marketing Representation Manager for Ford, regarding the SOT

18  condition and the length of time needed by the Corporation to repay the financing amount

19  due to Ford Credit.  Mr. Sheehan, on behalf of Ford, explained the options available to the

20  Corporation, including the Corporation's voluntary surrender of the Bob Lewis dealership,

21  or a buy-sell (i.e., the sale of the dealership).  Mr. Sheehan implied that of the two (2)

22  alternatives, a buy-sell would be more favorable to the Corporation.  Upon inquiry by the

23  Corporation, Ford indicated that the Bob Lewis dealership would not qualify for the Lincoln

24  Mercury dealership consolidation/reduction program because Joe Kerley Lincoln Mercury

25  had already resigned its Ford dealership under the program.

26       28.    Consequently, the Corporation began to explore the possible sale or

27  termination of the Bob Lewis dealership.  On or about June 14, 2007, the Corporation and

28  Capitol Ford commenced discussions regarding the potential purchase of the Bob Lewis

1   dealership by Capitol Ford.

2        29.    On or about June 18, 2007, the Corporation (via Lewis) informed Ford (by

3   way of Mr. Sheehan) that it was exploring the possible sale of the Bob Lewis dealership,

4   and was considering several potential buyers, including Capitol Ford.  Mr. Sheehan

5   expressed Ford's preference for the sale of the dealership to Capitol Ford, and indicated

6   that the buy-sell process would be expedited if the Corporation elected to sell its

7   dealership to Capitol Ford.

8        30.    On or about June 20, 2007, the Corporation began preliminary and informal

9   discussions with Shaun Del Grande ("Mr. Del Grande") for the sale of the Bob Lewis

10  dealership to the Del Grande family.  Discussions for the purchase of the Bob Lewis

11  dealership and its assets were in the range of approximately $300,000 to $500,000.  The

12  buy-sell terms discussed with Mr. Del Grande were more favorable to the Corporation

13  than those terms proposed by Capitol Ford for the purchase of the Bob Lewis dealership.

14       31.    On or about June 20, 2007, Mr. Sheehan (i.e., Ford) contacted Lewis to

15  indicate that, although Mr. Del Grande would be considered as a candidate for the

16  purchase of the Bob Lewis dealership, Ford ultimately preferred for the Corporation to sell

17  the dealership to Capitol Ford.  Mr. Sheehan additionally indicated that because Capitol

18  Ford was essentially pre-approved, Ford's formal approval process for the sale of the

19  dealership to Capitol Ford would be expedited.

20       32.    On or about June 20, 2007, Mr. Del Grande indicated to the Corporation that

21  the deal as previously discussed would not make financial sense due to Ford's imposition

22  of a $500,000 facility upgrade requirement.

23       33.    Consequently, the Corporation was left with two alternatives – either the sale

24  of the Bob Lewis dealership to Capitol Ford or the voluntary resignation of the dealership.

25  Because a buy-sell was preferable to the voluntary resignation of the Bob Lewis

26  dealership, the Corporation signed a letter agreement on or before June 22, 2007, with

27  Capitol Ford for the sale of the Bob Lewis dealership.  A copy of the letter agreement is

28  attached hereto as Exhibit A and is incorporated herein by this reference.  Capitol Ford

1  and the Corporation executed the letter agreement intending to enter into a binding,

2  written contract for the sale of the Bob Lewis dealership to Capitol Ford.

3          34.    Immediately thereafter, or on or about June 22, 2007, the Corporation

4  notified Ford Credit (i.e., Mr. Ward) of the impending sale of the Bob Lewis dealership to

5  Capitol Ford.

6          35.    On June 22, 2007, Ford Credit filed a Complaint for:  (1) Breach of

7  Wholesale Agreement; (2) Breach of Capital Loan Agreement; (3) Replevin; (4) Specific

8  Performance; (5) Injunctive Relief; and (6) Breach of Guaranty against Counterclaimants,

9  seeking to recover all outstanding inventory financing and capital amounts owed by the

10 Corporation.

11         36.    On June 26, 2007, Ford Credit filed an ex parte application for a writ of

12 possession and a temporary restraining order to take possession of the Corporation's

13 inventory, including its Lincoln Mercury automobiles.  On that same date, counsel for Ford

14 Credit provided Counterclaimants with ex parte notice.

15         37.    After being so informed, Lewis contacted Ford Credit (i.e., Mr. Ward) on or

16 aboutJune 26, 2007, to discuss the writ of possession.  Mr. Ward indicated that it would

17 not be in the best interest of either the Corporation or Ford Credit to execute the writ of

18 possession.  Rather, Mr. Ward explained that Ford Credit was merely "getting its ducks in

19 a row," and that it would "stand-down" or not pursue litigation during the pendency of the

20 Corporation's buy-sell with Capitol Ford.  The Corporation indicated to Ford Credit that it

21 was continuing to pay down the SOT or the outstanding financing amount due to Ford

22 Credit on the vehicles previously sold out of trust.

23         38.    On or about June 28, 2007, Capitol Ford circulated a subsequently proposed

24 asset purchase agreement or draft for consideration by the Corporation as pertaining to

25 the sale of the Bob Lewis dealership.  Negotiations as to this subsequently proposed

26 agreement continued between the Corporation and Ford Credit until August 13, 2007.

27         39.    On or about June 28, 2007, the Corporation advised Ford that Ford Credit

28 was severely restricting its ability to continue its business.  Ford (i.e., Mr. Sheehan)

1    reassured the Corporation that Ford would move quickly to approve the buy-sell between

2    Capitol Ford and the Corporation, and that it did not foresee any issue which would

3    hamper the approval process.    Mr. Sheehan further indicated that although Ford

4    recognized a customer satisfaction issue with Capitol Ford, Ford would be able to

5    negotiate around the issue given Capitol's Ford status as a Dealer Development

6    Dealership.  Ford further suggested that the Corporation direct its service business to

7    Capitol Ford given the agreement reached between Capitol Ford and the Corporation for

8    the sale of the Bob Lewis dealership to the former.

9         40.    On or about July 10, 2007, the Corporation/the Bob Lewis dealership closed

10    its service department and directed its service business to Capitol Ford based on the

11    representations of Ford and Capitol Ford as to the impending execution of the asset

12    purchase agreement and Ford's approval of the buy-sell.

13        41.    On or about July 18, 2007, the Corporation again met with Ford Credit to

14    review the SOT condition, and the terms of the buy-sell.  Ford Credit and the Corporation

15    estimated the SOT deficiency to be approximately $300,000 following the execution of the

16    asset purchase agreement with Capitol Ford.

17        42.    By August 2007, the Corporation had reduced the outstanding sum owed to

18    Ford Credit on the SOT from approximately $700,000 to $350,000.

19        43.    On or about August 1, 2007, the Corporation again met with Ford Credit (i.e.,

20    Mr. Lewis) to review the SOT condition.  For the first time, Mr. Ward threatened to seize

21    the inventory and assets of the Corporation.  However, the Corporation reminded Ford

22    Credit of the imminency of the execution of the asset purchase agreement by and

23    between the Corporation and Ford Credit.

24        44.    On or about August 1, 2007, the Court entered the default of

25    Counterclaimants in this action.  Counterclaimants had failed to answer Ford Credit's

26    complaint based on the representations of Ford and Ford Credit that no litigation would

27    occur during the pendency of Ford's approval of the buy-sell and the negotiations

28    concerning the asset purchase agreement.

45.    On or about August 2, 2007, the Court granted Ford Credit's application for a writ of possession and for a temporary restraining order.

46.    On or about August 13, 2007, Capitol Ford informed the Corporation that it would not be purchasing the Bob Lewis dealership.  By letter dated August 15, 2007, Capitol Ford indicated that its decision was independent of Ford and Ford Credit, and resulted from the litigation between Ford Credit and Counterclaimants as to the outstanding SOT and capital loan amount.

**E.    VOLUNTARY RESIGNATION OF THE BOB LEWIS DEALERSHIP**

47.    On or about August 16, 2007, the Corporation voluntarily resigned its franchise agreement with Ford (i.e., the Lincoln and Mercury Sales and Service Agreement dated January 12, 2004, and agreements related thereto).  Under the terms of the voluntarily resignation, Ford agreed to purchase certain assets of the Bob Lewis dealership (including the dealership's vehicles and other inventory), and agreed to turn over the inventory and/or payments therefor to Ford Credit in partial settlement of the Corporation's outstanding debt.

48.    Immediately thereafter (or on or about August 16, 2007), Lewis met with Mr. Ward (i.e., Ford Credit) to provide Ford Credit with notice that the Corporation was voluntarily resigning the Bob Lewis dealership to Ford.

49.    Ford's acceptance of the Corporation's voluntary resignation of the Bob Lewis dealership was conditioned on the Corporation's execution of a general release. Accordingly, on or about August 16, 2007, Lewis executed the general release provided by Ford on behalf of the Corporation.  Under the terms of the general release, the Corporation did not agree to waive unknown claims against Ford or claims existing after August 16, 2007.  In addition, the general release did not waive Ford's obligations to the Bob Lewis dealership under the Lincoln and Mercury Sales and Service Agreements.

50.    On or about August 17, 2007, Ford Credit executed its writ of possession despite its knowledge of the Corporation's voluntary resignation of the Bob Lewis dealership.  The Corporation immediately telephoned Ford (i.e., Mr. Sheehan), who

1  indicated that Ford Credit had acted erroneously given the Corporation's voluntary

2  resignation of the Bob Lewis dealership.  Ford indicated that it was too late to stop Ford

3  Credit from executing the writ, but assured the Corporation that it would honor the terms

4  of the voluntary resignation and would resolve the outstanding issues with Ford Credit.

5      51.    By letter dated August 20, 2007, Ford Credit informed the Corporation that

6  it would not begin to sell the Corporation's vehicle inventory, equipment, parts inventory,

7  and other property not repurchased by Ford and subject to Ford's security agreement, at

8  private sale, until "sometime after August 30, 2007," effectively providing the Corporation

9  with a ten (10) day redemption period.

10     52.    On or before August 30, 2007, Sunnyvale Lincoln Mercury committed to

11 acquire eight (8) of the Corporation's motor vehicles.  On that same date, the Corporation

12 notified Ford Credit, but was informed that Ford Credit had already began to sell and had

13 sold the inventory sought to be acquired by Sunnyvale Lincoln Mercury at private auction.

14     53.    On or about September 26, 2007, Ford accepted the Corporation's voluntary

15 termination of the Bob Lewis dealership, and acknowledged a termination date of

16 September 25, 2007.

## FIRST CAUSE OF ACTION

### (BREACH OF CONTRACT AS TO CAPITOL FORD AND FORD CREDIT)

19     54.    Counterclaimants incorporate by reference the allegations stated above in

20 paragraphs 1 through 53, inclusive, as if fully set forth herein.

21     55.    On or before June 22, 2007, Capitol Ford and the Corporation entered into

22 a written contract or letter agreement.  A copy of said contract is attached hereto as

23 Exhibit A, and is incorporated herein by this reference.

24     56.    The Corporation has at all times performed the terms of the contract as so

25 specified therein.

26     57.    Capitol Ford has failed and refused to perform its obligations under the

27 contract in that Capitol Ford has refused to purchase the Bob Lewis dealership under the

28 terms set forth in the written contract or letter agreement, Exhibit A hereto.

58.    Capitol Ford's failure and refusal to perform its obligations under the contract has resulted in significant monetary losses to Counterclaimants.  Specifically, the Corporation directed its service business to Capitol Ford in reliance on the terms of the contract attached hereto as Exhibit A.  Capitol Ford knew or should have known that the Corporation would rely on its promise to purchase the Bob Lewis dealership and that the promise would induce the Corporation to direct its service business to Capitol Ford.

59.    Based on Capitol Ford's failure and refusal to perform its obligations under the contract, Exhibit A hereto, the Corporation was left with no alternative but to voluntarily surrender the Bob Lewis dealership at great monetary loss to Counterclaimants.  Such monetary losses partially resulted from the subsequent ineligibility for repurchase by Ford of certain Ford Lincoln Mercury vehicles held by the Corporation.

60.    On or about December 12, 2003, the Corporation and Ford Credit entered into an Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement ("Wholesale Agreement") under which the Corporation established a wholesale line of credit to finance Ford motor vehicles, and other inventory, equipment and goods.  Under the terms of the Wholesale Agreement, Ford Credit covenanted that it would provide the Corporation "at least five days' written notice or such notice as required by law" before selling, at private or public sale, inventory seized from the Corporation as the result of an event of default.

61.    By writing dated August 20, 2007, and pursuant to the Wholesale Agreement, and Lewis's conversations with Ford Credit (i.e., Mr. Ward) and Ford (i.e., Mr. Sheehan), the Corporation was of the understanding that Ford Credit would not begin to auction the inventory of the Bob Lewis dealership until some time "after August 30, 2007."

62.    Ford Credit, however, auctioned the Corporation's vehicles and inventory prior to or on the date of August 30, 2007, in breach of its contractual agreement with the Corporation as set forth in the Wholesale Agreement and as memorialized in Ford Credit's August 20, 2007 letter.  Ford Credit's failure to adhere to its contractual obligations has resulted in substantial monetary losses to Counterclaimants.  Specifically, the Corporation

1    had secured private buyers for eight (8) of its vehicles, which would have resulted in a

2    greater setoff to the debt owed by the Corporation to Ford Credit than that resulting from

3    Ford Credit's private auction.

4        WHEREFORE, Counterclaimants pray for judgment against Counterdefendants

5    Ford, Ford Credit, and Capitol Ford (collectively, "Counterdefendants"), and each of them,

6    as hereinafter set forth.

7                    **SECOND CAUSE OF ACTION**

8            **(BREACH OF IMPLIED COVENANT OF GOOD FAITH**

9            **AND FAIR DEALING AS TO COUNTERDEFENDANTS**

10           **CAPITOL FORD, FORD, AND FORD CREDIT)**

11       63.    Counterclaimants incorporate by reference the allegations stated above in

12    paragraphs 1 through 62, inclusive, as if fully set forth herein.

13       64.    On or about June 8, 2007, Ford breached the implied covenant of good faith

14    and fair dealing with respect to the Lincoln and Mercury Sales and Service Agreements

15    executed by and between the Corporation and Ford in or about December 2003.  Implied

16    in these agreements was a covenant by Ford not to do anything which would deprive the

17    Corporation from the benefits of these contracts or otherwise injure the Corporation, to act

18    in good faith in executing and performing the terms of these contracts, and to do

19    everything that the contracts presuppose that Ford will do to accomplish the purposes of

20    these contracts.  On or about June 8, 2007, Ford unilaterally, unjustifiably, and unlawfully

21    imposed a facility upgrade requirement on the Corporation, with full knowledge of the

22    Corporation's financial difficulties, to hamper the Corporation's ability to carry on its

23    business.  Counterclaimants are informed and believe that Ford imposed the facility

24    upgrade requirement to force the Corporation to either sell or surrender the Bob Lewis

25    dealership.

26       65.    On or about June 20, 2007, Ford breached the implied covenant of good

27    faith and fair dealing with respect to the Lincoln and Mercury Sales and Service

28    Agreements executed by and between the Corporation and Ford in or about December

1    2003.  On or about that date, Ford unilaterally, unlawfully, and unjustifiably acted to

2    prevent the Corporation from selling the Bob Lewis dealership to Mr. Del Grande by

3    imposing a $500,000 facility upgrade requirement on the latter.  Ford imposed this

4    condition to prevent the sale of the Bob Lewis dealership to Mr. Del Grande so as to

5    ensure the sale of the dealership to Capitol Ford in which Ford has an ownership interest.

6    Significantly, Ford imposed only a $200,000 to $250,000 facility upgrade requirement on

7    Capitol Ford, and agreed to share the cost of the upgrade with Capitol Ford.  Such an

8    arrangement was not offered to Mr. Del Grande.

9    66.    On or about August 13, 2007, Ford breached the implied covenant of good

10   faith and fair dealing with respect to the Lincoln and Mercury Sales and Service

11   Agreements executed by and between the Corporation and Ford in or about December

12   2003.  In particular, Ford encouraged the Corporation to sell the Bob Lewis dealership to

13   Capitol Ford, and assured the Corporation that the buy-sell approval process would be

14   expedited.  Ford made these misrepresentations to secure the Corporation's service

15   business for the benefit of Capitol Ford and Ford (by virtue of its ownership interest in

16   Capitol Ford), and to secure the sale of the Corporation to Capitol Ford.  Ford also made

17   these misrepresentations to delay the Corporation's voluntary surrender of the Bob Lewis

18   dealership so as to further limit and reduce Ford's inventory repurchase obligations to the

19   Corporation.

20   67.    On or about August 13, 2007, Capitol Ford breached the implied covenant of

21   good faith and fair dealing with respect to the letter agreement or contract executed by

22   and between the Corporation and Capitol Ford on or before June 22, 2007 (Exhibit A

23   hereto).  Implied in this agreement was a covenant by Capitol Ford not to do anything

24   which would deprive the Corporation from the benefits of this contract or otherwise injure

25   the Corporation, to act in good faith in executing and performing the terms of this contract,

26   and to do everything that the contract presupposes that Ford will do to accomplish its

27   purposes.  On or about August 13, 2007, Capitol Ford refused to purchase the Bob Lewis

28   dealership from the Corporation contrary to its earlier representations, which resulted in

1  the Corporation's transfer of its service business to Capitol Ford on or about July 10,

2  2007.

3      68.    On or about August 17, 2007, Ford Credit breached the implied covenant of

4  good faith and fair dealing with respect to the Wholesale Agreement and the contracts

5  related thereto.  Implied in these agreements was a covenant by Ford not to do anything

6  which would deprive Counterclaimants from the benefits of these contracts or otherwise

7  injure Counterclaimants, to act in good faith in executing and performing the terms of

8  these contracts, and to do everything that the contracts presuppose that Ford will do to

9  accomplish the purposes of these contracts.  Despite its knowledge of the Corporation's

10  voluntary resignation of the Bob Lewis dealership on or about August 17, 2007, Ford

11  Credit nonetheless proceeded to execute on the writ of possession.  Thereafter, Ford

12  Credit auctioned the vehicles seized from the Bob Lewis dealership prior to the contractual

13  time provided for the Corporation to redeem those vehicles, resulting in substantial

14  monetary losses to the Corporation.

15      69.    In committing the acts described herein, Counterdefendants were guilty of

16  oppression, fraud, or malice.  Consequently, Counterclaimants are entitled to an award of

17  exemplary or punitive damages.

18      WHEREFORE, Counterclaimants pray for judgment against Counterdefendants,

19  and each of them, as hereinafter set forth.

20                  **THIRD CAUSE OF ACTION**

21              **(FRAUD AS TO COUNTERDEFENDANTS**

22          **FORD CREDIT, FORD, AND CAPITOL FORD)**

23      70.    Counterclaimants incorporate by reference the allegations stated above in

24  paragraphs 1 through 69, inclusive, as if fully set forth herein.

25      71.    Capitol Ford (in which Ford has an ownership interest) contracted to

26  purchase the Bob Lewis dealership by letter agreement dated on or before June 22, 2007.

27  Capitol Ford subsequently circulated an asset purchase agreement for negotiation by and

28  between Capitol Ford and the Corporation.  Capitol Ford and Ford represented to the

1   Corporation that Capitol Ford would be approved, and would acquire, the Bob Lewis

2   dealership on the terms specified in the June 22, 2007 letter agreement, Exhibit A hereto.

3   In addition, Ford (i.e., Mr. Sheehan) represented to Counterclaimants that it would

4   expedite the buy-sell approval process.  In so representing, Capitol Ford and Ford urged

5   the Corporation/the Bob Lewis dealership to direct its service business (i.e., the service of

6   Ford Lincoln Mercury vehicles) to Capitol Ford.  In reliance thereupon, the Corporation/the

7   Bob Lewis dealership directed its service business to Capitol Ford.

8          72.    On August 20, 2007, Ford Credit represented to the Corporation that it would

9   honor the terms of the finance documents entered by and between the Corporation and

10   Ford Credit, whereby the Corporation would have a ten (10) day redemption period to

11   secure buyers for the inventory of the Bob Lewis dealership to repay the outstanding debt

12   owed by the Corporation.  Prior to said ten (10) day period, Ford Credit auctioned and sold

13   the vehicle inventory of the Bob Lewis dealership at private sale, resulting in substantial

14   monetary losses to the Corporation, which had obtained a private buyer to purchase eight

15   (8) of the dealership's vehicles.  The Corporation's negotiated deal with the private buyer

16   (i.e., Sunnyvale Lincoln Mercury) would have enabled it to reduce its debt to Ford Credit

17   by an amount far greater than the debt offset obtained from the proceeds of the private

18   sale/auction effectuated by Ford Credit.

19          73.    When Counterdefendants made the oral and written representations

20   described above, these misrepresentations were made by Counterdefendants with the

21   intent to defraud and deceive Counterclaimants.

22          74.    In making the misrepresentations detailed above, Ford and Capitol Ford

23   intended to induce Counterclaimants to direct the Corporation's service business to

24   Capitol Ford in which Ford has an ownership interest to the monetary benefit of Capitol

25   Ford and Ford, and at the expense of the Corporation.

26          75.    In making the misrepresentations detailed above, Ford intended to induce

27   Counterclaimants to refrain from or to delay the Corporation's resignation of the Bob

28   Lewis dealership so as to reduce or limit Ford's inventory repurchase obligations to the

1  Corporation.

2      76.    In making the misrepresentations detailed above, Ford Credit intended to

3  prevent the Corporation from securing private buyers of the Corporation's inventory so as

4  to benefit Ford Credit to the detriment of Counterclaimants.

5      77.    As a direct and proximate result of the misrepresentations of

6  Counterdefendants, Counterclaimants have sustained substantial monetary damages.

7      78.    In making the misrepresentations described herein, Counterdefendants were

8  guilty of oppression, fraud, or malice.  Consequently, Counterclaimants are entitled to an

9  award of exemplary or punitive damages.

10     WHEREFORE, Counterclaimants pray for judgment against Counterdefendants,

11 and each of them, as hereinafter set forth.

12                    **FOURTH CAUSE OF ACTION**

13     **(INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AS TO**

14            **COUNTERDEFENDANTS FORD AND FORD CREDIT)**

15     79.    Counterclaimants incorporate by reference the allegations stated above in

16 paragraphs 1 through 78, inclusive, as if fully set forth herein.

17     80.    The Corporation had a valid and existing contract with Capitol Ford under

18 which Capitol Ford agreed to acquire the Bob Lewis dealership, and inventory thereof.

19 The contract was entered into on or before June 22, 2007.  A copy of the contract is

20 attached hereto as Exhibit A and is incorporated herein by this reference.

21     81.    Ford and Ford Credit knew of the contract between Capitol Ford and

22 the Corporation.

23     82.    Ford and Ford Credit intentionally induced Capitol Ford to breach its contract

24 with the Corporation by informing Capitol Ford that Counterclaimants were in severe

25 financial difficulty, and that Capitol Ford would be required and unable to meet

26 Counterclaimants' obligations to Ford Credit.  Ford and Ford Credit knew these

27 representations to be untrue.

28     83.    As a result of the intentional acts of Ford and Ford Credit, the business

1 relationship between Capitol Ford and the Corporation was disrupted in that Capitol Ford

2 breached its contractual relationship with the Corporation and refused to purchase the

3 Bob Lewis dealership.

4      84.    The intentional inference of Ford and Ford Credit with the business

5 relationship between the Corporation and Capitol Ford has directly and proximately

6 resulted in monetary damages to Counterclaimants in excess of $350,000.

7      85.    In committing the acts described herein, Ford and Ford Credit were guilty of

8 oppression, fraud, or malice.  Consequently, Counterclaimants are entitled to an award of

9 exemplary or punitive damages.

10      WHEREFORE, Counterclaimants pray for judgment against Ford and Ford Credit,

11 and each of them, as hereinafter set forth.

12                          **FIFTH CAUSE OF ACTION**

13                   **(INTENTIONAL INTERFERENCE WITH PROSPECTIVE**

14            **ECONOMIC ADVANTAGE AS TO COUNTERDEFENDANTS**

15                          **FORD AND FORD CREDIT)**

16      86.    Counterclaimants incorporate by reference the allegations stated above in

17 paragraphs 1 through 85, inclusive, as if fully set forth herein.

18      87.    Counterclaimants were in negotiations with Mr. Del Grande for the sale of

19 the Bob Lewis dealership to the Del Grande family.  The Corporation expected to realize a

20 net profit of approximately $350,000 from the sale of the Bob Lewis dealership to Mr. Del

21 Grande.

22      88.    Ford knew of the relationship or the negotiations between the Corporation

23 and Mr. Del Grande for the sale of the Bob Lewis dealership.

24      89.    Ford intentionally disrupted the relationship between the Corporation and Mr.

25 Del Grande by falsely and unjustifiably imposing a $500,000 facility renovation

26 requirement to impede Mr. Del Grande's purchase of the Bob Lewis dealership.  Such a

27 condition was not imposed on Capitol Ford.  To the contrary, Ford imposed a much lower

28 facility renovation requirement upon Capitol Ford and agreed to bear a portion of the cost.

1    Such favorable terms were not offered by Ford to Mr. Del Grande.

2        90.    Counterclaimants are informed and believe that Ford mandated the facility

3    renovation after its awareness of the Corporation's financial difficulties to induce the

4    Corporation to sell the Bob Lewis dealership to Capitol Ford, in which Ford had and has

5    an ownership interest via the Dealer Development Program; and to delay the

6    Corporation's voluntary surrender of the Bob Lewis dealership.

7        91.    As a result of Ford's intentional acts, Mr. Del Grande's negotiations with the

8    Corporation for the purchase of the Bob Lewis dealership stalled and were no longer as

9    favorable to the Corporation.

10        92.    Ford's interference with the business relationship between the Corporation

11    and Mr. Del Grande has resulted in damages to Counterclaimants in excess of $350,000.

12        93.    Ford Credit was aware of the Corporation's buy-sell with Capitol Ford for the

13    sale of the Bob Lewis dealership.  Ford Credit intentionally disrupted the relationship

14    between Capitol Ford and the Corporation by misrepresenting the extent of the

15    Corporation's financial obligations to Ford Credit, resulting in Capitol Ford's failure to

16    purchase the Bob Lewis dealership and resulting in substantial monetary losses to the

17    Corporation.

18        94.    In committing the acts described herein, Ford and Ford Credit were guilty of

19    oppression, fraud, or malice.  Consequently, Counterclaimants are entitled to an award of

20    exemplary or punitive damages.

21        WHEREFORE, Counterclaimants pray for judgment against Ford and Ford Credit,

22    and each of them, as hereinafter set forth.

23                    **SIXTH CAUSE OF ACTION**

24        **(VIOLATION OF 15 U.S.C. § 1222 AS TO COUNTERDEFENDANTS**

25                **FORD, FORD CREDIT, AND CAPITOL FORD)**

26        95.    Counterclaimants incorporate by reference the allegations stated above in

27    paragraphs 1 through 94, inclusive, as if fully set forth herein.

28        96.    Ford Credit and Capitol Ford act for and are under the control of Ford in

1 connection with the distribution of Ford Lincoln Mercury automotive vehicles within the

2 meaning of 15 U.S.C. § 1221, subdivision (a).

3     97.     By committing the acts detailed in this counterclaim, Counterdefendants

4 failed to act in good faith in performing or complying with the terms of its agreements (i.e.,

5 franchise agreements and contracts related thereto) with the Corporation in violation of

6 the Dealer's Day In Court Act (15 U.S.C. § 1221, et seq.).

7     98.     Consequently, Counterclaimants are entitled to monetary damages and the

8 costs incurred in pursuing the instant suit/counterclaim.

9     WHEREFORE, Counterclaimants pray for judgment against Counterdefendants,

10 and each of them, as hereinafter set forth.

11                                      **PRAYER**

12     WHEREFORE, Counterclaimants pray for judgment against Counterdefendants as

13 follows:

14     1.     For monetary damages in an amount to be determined at trial;

15     2.     For prejudgment interest on the monetary damages awarded at the legal

16 rate;

17     3.     For punitive damages as determined at trial;

18     4.     For reasonable attorney's fees;

19     5.     For costs of suit; and

20     6.     For such other and further relief as the Court deems just and proper.

21

22                                      Respectfully submitted,

23 Dated: December __4__, 2007               RANKIN, LANDSNESS, LAHDE,
                                             SERVERIAN & STOCK
24

25

26                                      By: _____
                                           David J. Stock, Attorneys for
27                                         for Defendants LEWIS FAMILY
                                           ENTERPRISES, INC. and
28                                         STEVEN ROBERT LEWIS

                                        21
                     COUNTERCLAIM; DEMAND FOR JURY TRIAL

1

2                              **DEMAND FOR JURY TRIAL**

3

4        Counterclaimants LEWIS FAMILY ENTERPRISES, INC., dba BOB LEWIS

5   LINCOLN MERCURY, and STEVEN ROBERT LEWIS hereby demand a trial by jury.

6

7                                              Respectfully submitted,

8   Dated: December  4 , 2007                  RANKIN, LANDSNESS, LAHDE,
                                                SERVERIAN & STOCK
9

10

11                                         By: _____
                                              David J. Stock, Attorneys for
12                                            for Defendants LEWIS FAMILY
                                              ENTERPRISES, INC. and
13                                            STEVEN ROBERT LEWIS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        22
                        COUNTERCLAIM; DEMAND FOR JURY TRIAL

# Exhibit A

**New Vehicles**: Buyer will purchase new 2007 and 2008 Lincoln Mercury vehicles at the Dealer Net Cost, Which is less any factory rebates or allowances that the dealership has received or will receive on these vehicles. Any equipment added by the dealership will be purchased at dealer cost.

**Pre-Owned Vehicles:** Buyer will purchase all, none or some at a price to be negotiated between a representative of the Seller and a representative of the Buyer.

**Service Vehicles:** Buyer will purchase all, none or some at a price to be negotiated between a representative of the Seller and a representative of the Buyer.

**Parts and Accessories Inventory:** Buyer will purchase at current dealer net cost based on inventory of parts by an independent inventory service. Buyer has no obligation to purchase damaged, used, obsolete parts, parts not used on Lincoln Mercury Division vehicles or parts kits that have components missing. ~~Seller and~~ Buyer will ~~share~~ pay the cost of the inventory service equally.

**Equipment:** Buyer will purchase from Seller selected tools and equipment related to Lincoln Mercury franchise as mutually agreed upon. The purchase price will be determined by the independent appraisal conducted by a licensed dealership appraisal service, or by any other means agreed to by the Seller and Buyer. ~~Seller and~~ Buyer will pay ~~share~~ the cost of the appraisal equally.

**Goodwill:** Seller will receive a total of $25,000 Goodwill for the use of the customer sales lists, customer service files, internet website, business trade name and the right to handle customer lease turn-ins etc.

**Consulting Fee:** Mr. Steve Lewis will receive $25,000 as payment for performing a consulting services fee. He will advise and council Capitol Expressway Ford with Lincoln Mercury Franchise process and procedure for a period not to exceed 90 days. The amount of $25,000 will be paid at the close of escrow.

*The attached offer is good till C.O.B. Friday, June, 22, 2007.*

Sergio Madrigal
President
Capitol Expressway Ford
919 Capitol Expressway/Auto Mall
San Jose, CA. 95136

_____
Acceptance Signature

Steve Lewis
President
Bob Lewis Lincoln Mercury
911 Capitol Expressway Auto Mall
San Jose, CA. 95136

_____
Acceptance Signature