**United States District Court**
For the Northern District of California

*E-Filed 05/19/2010*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

FORD MOTOR CREDIT COMPANY, LLC,

Plaintiff,

v.

LEWIS FAMILY ENTERPRISES, INC., et al.,

Defendants.

_____

LEWIS FAMILY ENTERPRISES, INC., et al.,

Counter-claimants,

v.

FORD MOTOR CREDIT COMPANY, LLC, FORD MOTOR COMPANY, CAPITOL EXPRESSWAY FORD, INC.,

Counter-defendants.

_____/

No. C 07-03301 RS

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AND COUNTER-DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

I.  INTRODUCTION

United States District Court
For the Northern District of California

1    This action flows from the downfall of a privately owned car dealership.  Ford Credit

2    Company ("Ford Credit") moves as plaintiff for summary judgment on its breach of contract claims

3    against Lewis Family Enterprises ("LFE").  As counter-defendants, Ford Credit, Ford Motor

4    Company ("Ford Motor"), and a second San Jose Ford dealership, Capitol Expressway Ford

5    ("Capitol Ford") move for summary judgment on all counterclaims advanced by LFE's president,

6    Robert Steven Lewis.

7    As to Ford Credit's breach of contract motion, genuine issues of material fact exist and its

8    motion must therefore be denied.  In particular, Lewis has pointed to disputed material facts in

9    support of his theory that Ford Credit promised to modify the enforcement terms of one of the

10   interrelated agreements at issue.

11   Each of the counter-defendants separately moves for summary judgment on the

12   counterclaims Lewis advances.  Ford Credit moves for summary judgment on Lewis' counterclaim

13   that the financing company breached the same contracts it seeks to enforce.  Lewis lacks standing to

14   enforce these contracts or the covenants implied therein and Ford Credit's motion will therefore be

15   granted.  Ford Credit also moves for summary judgment on Lewis' counterclaim that it intentionally

16   interfered with the alleged contractual relationship between Lewis and Capitol Ford.  Questions of

17   fact linger and Ford Credit's motion will be denied.  Next, both Ford Motor and Ford Credit move

18   for summary judgment on Lewis' fraud, intentional interference with prospective economic

19   advantage, and the Dealer's Day in Court Act ("DDCA"), 15 U.S.C. § 1222, claims.  Because Lewis

20   either lacks standing to bring these claims as an individual or because he has not introduced any

21   disputed material facts, these counter-claims may be resolved at the summary judgment phase in

22   favor of the Ford entities.

23   Capitol Ford moves for summary judgment on Lewis' counterclaims alleging breach of

24   contract, breach of the implied covenant of good faith and fair dealing, fraud, and violation of the

25   DDCA.  Lewis advances disputed, material facts that go to the question of the parties' intent to bind

26   themselves to an asset purchase in a Letter Agreement.  Similarly, questions of fact arise under

27   Lewis' fraud claim.  Insofar as Capitol Ford's arguments for summary judgment of the breach of the

28   implied covenant assume the non-existence of a contract, Capitol Ford has not met its burden and its

United States District Court

For the Northern District of California

1   motion to terminate these claims at the summary judgment phase will be denied.  Finally, because

2   the DDCA does not apply to Capitol Ford, its motion for summary judgment on that claim will be

3   granted.

4                                         II.  RELEVANT FACTS

5          Between December of 2003 and September of 2007, LFE owned and operated Bob Lewis

6   Lincoln Mercury, a new and used automobile dealership then located at 911 Capitol Expressway in

7   San Jose, California.  Throughout this period, LFE entered into numerous contracts, letters of

8   agreement, guarantees, and releases of liability with the plaintiffs and counter-defendants.

9          At the outset, LFE entered into a franchise agreement with Ford Motor in 2003.  To finance

10  its vehicle inventory, LFE contracted with Ford Credit.  The parties agreed to "floor plan" financing

11  whereby Ford Credit provided funds to acquire vehicles directly from Ford Motor or elsewhere.

12  LFE and Ford Credit memorialized the financing plan in a "Wholesale Agreement," dated

13  December 12, 2003.  Under the terms of that agreement, LFE relinquished to Ford Credit a security

14  interest in its vehicle and equipment inventory.  It further agreed to remit the unpaid balance to Ford

15  Credit whenever it sold or leased an encumbered vehicle.  Failure to meet this payment obligation—

16  by a sale "out of trust"—resulted in breach of the Agreement.  On January 13, 2004, Ford Credit

17  loaned LFE $800,000 pursuant to a "Capital Loan Agreement."  A cross default provision provided

18  that a default under *any other* contract between LFE and Ford Credit constituted default under the

19  Capital Loan Agreement.  Upon default, Ford Credit could elect to accelerate the entire balance.

20  Lewis executed a Continuing Guarantee on December 13, 2003 of LFE's obligations to Ford Credit

21  under the Wholesale Agreement.  On January 13, 2004, he entered into a parallel guarantee of those

22  funds loaned under the Capital Agreement.

23         On June 5, 2007, Ford Credit claims it discovered that in the preceding four months, LFE

24  sold thirty-one vehicles "out of trust."  In so doing, LFE failed to remit more than $700,000 to Ford

25  Credit.  LFE acknowledges the out of trust sales, but explains that the oversight was the result of a

26  clerical error.  Ford Credit avers it made a written demand for immediate payment of $969,523.55

27  but contends that LFE did not perform.[1]  Lewis counters that a representative of Ford Credit, Phil

28
---
[1] Because the out-of-trust default under the Wholesale Agreement worked also as a default under the
Capital Loan Agreement, Ford Credit argues here that it is entitled to the balance due there as well.

Ward, explained that the company would not demand immediate payment in full but would instead continue to provide strictly scrutinized financing to "ensure the [dealership's] continued operation." Lewis insists Ward promised—once on June 5 and again after Ford Credit filed the instant Complaint—to "stand down" with regard to litigation.  In return, Lewis explains he was to endeavor in good faith to reduce the debt and to find a purchaser.  Over the next few weeks, LFE did shrink the outstanding balance from the out of trust sales and found two potential buyers.  In fact, LFE reduced the out of trust debt to $305, 976.98 over the course of three weeks.  Lewis blames the ultimate break-down in negotiations with both purchasers on the behavior of Ford Credit, Ford Motor and, in part, on the subject litigation.

On June 22, 2007, Ford Credit filed the instant complaint alleging breach of contract.  It also moved for a temporary restraining order and writ of possession over the dealership's inventory. Lewis avers he contacted Phil Ward of Ford Credit several days later.  According to Lewis, Ward assured him that it would not be in Ford Credit's interest to execute on the writ.  Ward apparently explained his company was merely "getting its ducks in a row" but would not pursue litigation at the expense of the on-going negotiations with Capitol Ford.  The Court issued a TRO on June 29, 2007. After an August 1, 2009 hearing, the Court granted Ford Credit's application for the writ.  Ford Credit executed the writ and repossessed LFE's entire inventory on August 17.  It then sold qualifying new vehicles back to Ford Motor and used or older model vehicles at auction.  LFE counters that Ford Credit's internal records call into question whether an actual auction ever took place.  As LFE interprets them, the records suggest a more exclusive but unexplained private bidding process.

At roughly the same point in time, June of 2007, Lewis sought potential buyers for the dealership and its assets.  LFE contends that Ford Motor also insisted at that time that LFE refurbish and upgrade its facility at its own expense.[2]  The first potential buyer, Shaun Del Grande, apparently lost interest in the dealership when he learned that the required upgrade would cost between

---

[2] LFE explains that, prior to April of 2007, Bob Lewis Lincoln Mercury was located at 909 West Capitol Expressway in San Jose.  The premises were leased from the Ford Leasing Development Company.  In the fall of 2007, LFE asked to relocate the dealership to 911 Capitol Expressway, which was property LFE already owned.  LFE notes that the move saved it more than $40,000 each month in rent.  Ford approved LFE's request on the condition that LFE bear the cost of purchasing and installing the Ford Company's new signage.

United States District Court
For the Northern District of California

$250,000 and $500,000.  The second prospective buyer was Capitol Ford.  On June 22, 2007, Lewis and Capitol Ford's president, Sergio Madrigal, signed what all parties agree was a letter of some import.  Lewis characterizes the Letter as an enforceable written contract that bound Capitol Ford to purchase LFE's assets.  As evidence of reliance on the agreement (and in response to Ford Motor's supposed encouragement), Lewis points out that on July 10, LFE closed its service department and directed customers to Capitol Ford.  The Letter, Capitol Ford counters, lacked essential terms and was merely an expression of intent, an invitation to deal, or an agreement to agree.  It also suggests that LFE closed its service department only as a matter of necessity after terminating employees and not in reliance on any agreement.

Over the ensuing weeks, the parties' legal representatives exchanged seven drafts of a longer purchase agreement.  Capitol Ford requested that Lewis disclose active lawsuits or liens.  Capitol Ford submits copies of several e-mail exchanges where its counsel requested this information.  While Lewis avers he at least mentioned the out of trust dilemma to Madrigal, Capitol Ford claims it only learned of Ford Credit's lawsuit and writ of possession on August 7, 2007, when Lewis' counsel attached the information to the last draft purchase agreement.  Upon learning of Ford Credit's lawsuit, the out of trust figures, and the writ of possession against LFE's vehicle inventory, Capitol Ford was no longer interested in continuing negotiations and through counsel so advised LFE.  Lewis then telephoned Madrigal on August 16 and, according to the latter, urged Capitol Ford to "get [the] deal back on track."  Madrigal recounts that he responded with the suggestion that Lewis or his father guarantee repayment of all outstanding loans to Ford Credit.  According to Madrigal, Lewis exclaimed "absolutely not!" and abruptly hung up his telephone.

With no other interested buyers, LFE relinquished its franchise agreement with Ford Motor on August 16, 2007.  Ford Motor purchased a portion of LFE's vehicle inventory and remitted the funds to Ford Credit.  Ford Motor conditioned the buy-back on LFE's execution of a comprehensive general release, discharging civil claims arising prior to August 16.  Lewis signed the release.  On August 17, 2007, Ford Credit exercised its writ of possession.  Two days later, Ford Credit sent Lewis and LFE a letter evidencing its intent to sell the inventory in at least ten days' time.  LFE did not redeem the inventory.  Ford Credit submits a dated sale log to demonstrate it honored the ten-

1    day window.

2                                  **III.  LEGAL STANDARD**

3        Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall

4 be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

5 file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

6 and that the moving party is entitled to a judgment as a matter of law."  The party who seeks

7 summary judgment bears the initial responsibility of identifying an absence of a genuine issue of

8 material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies this

9 initial burden, it shifts to the non-moving party to present specific facts showing that there is a

10 genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  "Only disputes over facts

11 that might affect the outcome of the suit under governing law" are material.  *Anderson v. Liberty*

12 *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue exists if the non-moving party presents

13 evidence from which a reasonable fact-finder, viewing the evidence in the light most favorable to

14 that party, could resolve the material issue in his or her favor.  *Id.* at 248-49.

15                                    **IV.  DISCUSSION**

16 A.   <u>Ford Credit's Motion for Summary Judgment</u>

17        1.   <u>Ford Credit's Breach of Contract Claims</u>

18        Ford Credit argues first that LFE breached both the Wholesale and Capital Loan

19 Agreements.  In California, material breach requires proof of the following elements: (1) existence

20 of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and

21 (4) damages to plaintiff as a result of breach.  *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th

22 1226, 1239 (2008).  LFE does not deny the out of trust sales and even concedes that, at least on June

23 5, Ford Credit had a valid breach of contract claim.  LFE argues, though, that Ford Credit promised

24 at that time to modify the enforcement terms.[3]

25          _____

26 [3] LFE also suggests that damages cannot in any case be resolved at the summary judgment phase
because questions of fact remain as to whether Ford Credit disposed of the inventory in a

27 commercially reasonable manner.  Even assuming Ford Credit was entitled to repossess LFE's
inventory, the California Uniform Commercial Code requires that it do so in a commercially

28 reasonable manner.  Cal. Com. Code § 9610(b).  Ford Credit explains it sold sixteen vehicles back
to Ford Motor and thirty-six at an auction open to other dealers.  Section 9627(b) of the Commercial

**United States District Court**
For the Northern District of California

1        LFE agrees that, according to the terms of both agreements, Ford Credit was within its

2  contractual rights to demand full payment.  It argues, though, that Ford Credit's representatives

3  promised to help LFE resolve the out of trust dilemma rather than demand immediate payment in

4  full.  Essentially, LFE argues that Ford Credit's actions effected an oral modification of the

5  contract's terms.  So long as LFE quickly repaid a substantial amount of the balance and endeavored

6  in good faith to find a purchaser to cover the deficiency, LFE insists Ford Credit promised it would

7  not accelerate the outstanding balance or pursue the instant litigation.

8        California Civil Code section 1698 governs modification of written contracts:

9

10    (a) A contract in writing may be modified by a contract in writing.
(b) A contract in writing may be modified by an oral agreement to the extent that
the oral agreement is executed by the parties.

11    (c) Unless the contract otherwise expressly provides, a contract in writing may be
modified by an oral agreement supported by new consideration. The statute of

12    frauds (Section 1624) is required to be satisfied if the contract as modified is
within its provisions.

13

14    (d) Nothing in this section precludes in an appropriate case the application of
rules of law concerning estoppel, oral novation and substitution of a new

15    agreement, rescission of a written contract by an oral agreement, waiver of a
provision of a written contract, or oral independent collateral contracts.

16

---

17  Code provides that a disposition is "commercially reasonable" if it "is made in the usual manner on
any recognized market," is sold "at the price current in any recognized market at the time of the

18  disposition," or is "otherwise in conformity with reasonable commercial practices among dealers in
the type of property that was the subject of the disposition."

19        Commercial reasonableness is a question of fact.  *Clark Equipment Co. v. Mastelotto, Inc.*,

20  87 Cal. App. 3d 88, 96 (1978).  Ford Credit contends that summary judgment is appropriate where
the moving party amply demonstrates reasonableness and the opposing party fails to inject any

21  material facts in rebuttal.  *See, e.g.*, *Ford Motor Credit Co. v. Russell*, 519 N.W.2d 460, 456 (Minn.
App. 1994).  As to the sixteen sales back to Ford Motor, Ford Credit maintains that the Wholesale

22  Agreement provided that the method was commercially reasonable.  The relevant language states
that these direct sales are reasonable where price equals "the invoice cost thereof to Dealer less any

23  credits granted to Dealer with respect thereto and reasonable costs of transportation and

24  reconditioning."  Ford Credit has submitted the amounts Ford Motor paid for the repurchased
vehicles; LFE contends that price, without explanation of how it was deduced, is not enough to

25  demonstrate compliance even with paragraph nine.  An invoice price is easily ascertainable.  The
shortfall—here, $44,340.90 for sixteen vehicles—should include only credits and reasonable costs

26  of transportation and reconditioning.  LFE notes that Ford Credit shipped the complete vehicle

27  inventory to Sacramento but contends that, in light of a closer Hayward location and the fact that
some resold vehicles were returned to Capitol Ford in San Jose, at least some of the shipping

28  expenses were *not* reasonable.  Without any evidence as to what, exactly, the $44,340.90 represents,
it is not appropriate to presume these sales were commercially reasonable.

1   Cal. Civ. Code § 1698.  To support its modification argument, LFE advances a theory of

2   promissory estoppel resting on subsection (d).

3   The promissory estoppel doctrine "make[s] a promise binding under certain circumstances,

4   without consideration in the usual sense of something bargained for and given in exchange."

5   *Youngman v. Nevada Irrigation Dist.*, 70 Cal. 2d 240, 249 (1969).  *See also Wade v. Markell & Co.*,

6   118 Cal. App. 2d 410, 421 (1953) ("[W]hile it is settled in view of section 1698 of the Civil Code

7   which provides that a written contract may be altered by a contract in writing, or by an executed oral

8   agreement but not otherwise, nevertheless, it is also true that the facts of a particular case may give

9   rise to an equitable estoppel against the party who denies the verbal modification.").  The equitable

10  doctrine requires: (1) a promise that is clear and unambiguous; (2) actual reliance by the party to

11  whom the promise is made; (3) reasonable and foreseeable reliance; and (4) injury to the party

12  asserting estoppel connected to his or her reliance.  *Ecology, Inc. v. California*, 129 Cal. App. 4th

13  887, 901-02 (2005).  "The vital principle is that he who by his language or conduct leads another to

14  do what he would not otherwise have done shall not subject such person to loss or injury by

15  disappointing the expectations upon which he acted."  *Wilson v. Bailey*, 8 Cal. 2d 416, 423 (1937)

16  (citations omitted).  The availability of a promissory estoppel claim is generally a question of fact.

17  *State of California v. Haslett Co.*, 45 Cal. App. 3d 252, 256 (1975).  The issue is appropriate for

18  summary judgment, however, where an estoppel claim could not exist as a matter of law.  *Id.*

19       i.   Clear and Unambiguous Promise

20  On June 5, 2007, a Territory Sales Manager for Ford Credit, Phil Ward, discussed a delayed

21  payment plan and suggested Lewis find a potential buyer to help winnow down the debt.  LFE

22  explains that Ward proposed continued extensions of credit if the dealership steadily made

23  payments; Lewis claims these extensions took place.  LFE also insists Ward reiterated later that

24  June the promise not to pursue the writ.  In his deposition testimony, Ward testified, "[t]he intent is

25  always to try and help the dealer work through this and minimize the loss . . . and try to keep the

26  dealership point open."  In response to the question, "On June 5th, 2007, did you tell Mr. Lewis that

27  you would help him work through this out-of-trust issue?" Ward replied, "Sure, probably did."[4]

28  ──────────────
[4] Ford Credit's internal records also mention "develop[ing] an immediate plan to pay Ford Credit,"
and reason that "[i]f [the] dealer can pay a substantial amount toward the SOT within a week's time

United States District Court

For the Northern District of California

1    Ford Credit responds by vigorously denying it made any such promise.  It reasons that Lewis

2    was obligated by contract to pay back the entire amount, that Lewis maintained that it was

3    impossible to repay all the debt, and so Ford Credit tried to accommodate him temporarily.  Ford

4    Credit argues it never promised it would forebear collection on the debt or refrain from pursuing

5    legal remedies.  According to Ford Credit, as soon as it was clear that Lewis would never

6    completely pay back the debt and that a potential sale would not cover the full amount owed, it

7    exercised the writ of possession.  Both parties rely heavily on deposition testimony to support these

8    competing inferences but neither side submits any dispositive undisputed evidence.  Material facts

9    therefore remain in dispute as to the existence of Ford Credit's purported promise and its effect on

10   the parties' contractual relationship.

11        ii.   Actual Reliance that is Reasonable and Foreseeable

12   LFE insists that it relied on Ford Credit's promise when, for example, it searched for

13   potential purchasers and turned over the dealership's service business to Capitol Ford without

14   payment.  In *Raedeke v. Gibraltar Savings and Loan Association*, the California Supreme Court

15   held that a borrower's procurement of a purchaser demonstrated not merely reliance in support of

16   the plaintiff's promissory estoppel claim, but also constituted new consideration.  10 Cal. 3d 665,

17   673 (1974).  There, a lender promised in a telephone conversation to delay a home foreclosure sale

18   if the borrower found a viable purchaser.  The borrower did find an interested buyer but the lender

19   foreclosed nonetheless.  Because it was not contemplated in the parties' original loan agreement, the

20   court found "both detriment to plaintiffs (through the expenditure of time and energy negotiating

21   with possible purchasers) and benefit to [the lender] (through the potential substitution of a solvent

22   purchaser in place of plaintiffs, rendering foreclosure unnecessary)."  *Id.*  Here, LFE did not

23   ultimately succeed in its attempt to find a purchaser (a result LFE blames at least in part on Ford

24   Credit) but was in no way obligated to find one.  The time and expense LFE dedicated to wooing

25   Capitol Ford are facts that could demonstrate its reliance.  Moreover, LFE's pursuit of a purchaser

26   as well as its redirection of the service business to that purchaser could also support an inference

27   ($300-500K) and if we can verify the buy/sell . . . and if it will generate funds to pay-off Ford Credit

28   completely, we would craft a forbearance agreement to allow the dealer to operate until the sale."
Even if the language is conditional, LFE insists it satisfied every condition: it did pay back nearly
half of the out of trust debt in a matter of weeks and found two prospective purchasers.

United States District Court

For the Northern District of California

1    that LFE's behavior was a reasonable and foreseeable response to Ward's assurances.

2            iii.   Injury

3            LFE must show not merely that it relied on Ford Credit's promise but also that it did so to its

4    detriment.  The dealership points to the potential profits it lost when it redirected its service

5    customers to Capitol Ford.  Lewis does admit in his opposition that LFE had, in response to its

6    financial woes, terminated several employees and was concerned with the dealership's "difficulty

7    providing prompt turnaround on customer service requests."  (Lewis' Opp'n at 10:19.)  These

8    circumstances might have compelled the loss of some of these profits anyway.  That said, LFE notes

9    that it could have directed its business elsewhere for payment.  Lewis explains, though, that the Ford

10   companies preferred Capitol Ford and stalwartly encouraged the maneuver.  Accordingly, a

11   reasonable fact-finder could agree that promissory estoppel is an adequate defense to Ford Credit's

12   breach of contract claims.  Resolution of Ford Credit's breach claims at the summary judgment

13   phase would, accordingly, be inappropriate.

14           2.   Lewis' Personal Guarantees to Ford Credit

15           Ford Credit moves for summary judgment on its claim that the out of trust breach constitutes

16   a default under Lewis' two personal guarantees.  Lewis personally guaranteed LFE's obligations

17   under, among other contracts, the Wholesale Agreement.  Lewis' obligation under the Wholesale

18   Agreement depends on resolution of his promissory estoppel theory.[5]  Summary judgment enforcing

19   Lewis' obligation under the two guarantees must therefore be denied.

20   B.  Ford Credit and Ford Motor's Motions for Summary Judgment of Lewis' Counterclaims

21           Ford Credit and Ford Motor move for summary judgment of Lewis' counterclaims as alleged

22   against each of them.  Lewis, as an individual, counter-claims that Ford Credit breached the

23   Wholesale Agreement.  He also claims that both Ford entities violated an implied covenant of good

24   faith and fair dealing, committed fraud, intentionally interfered with the contractual relationship

25   between Lewis and Capitol Ford, intentionally interfered with his prospective economic advantage,

26   and violated the DDCA.

27   _____

28   [5] The question of commercial reasonableness, *see supra*, at n.3, also affects Lewis' obligation under
     the Guarantees; if LFE can prove Ford Credit's methods were not in fact reasonable, Lewis'
     obligation may ultimately require adjustment.

1.  <u>Lewis' Standing to Bring Counterclaims</u>

Ford Credit and Ford Motor contend that Lewis lacks standing to bring counterclaims that seek to enforce LFE's contracts with them.  Generally, a "stockholder may not maintain an action in his own behalf for a wrong done by a third person to the corporation on the theory that such wrong devalued his stock and the stock of the other shareholders, for such an action would authorize multitudinous litigation and ignore the corporate entity."  *Sutter v. Gen. Petroleum Corp.*, 28 Cal. 2d 525, 530 (1946).  An individual lacks standing to bring an action where "the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets."  *Id.*

Lewis alleges first that Ford Credit breached the Wholesale Agreement when it failed to wait the requisite number of days between when it notified Lewis of its intention to resell the seized collateral and the date of sale.[6]  Ford Credit argues that because Lewis is not a party to the agreements, he does not have standing to enforce them.  Although he signed the documents, he did so on LFE's behalf and in his capacity as president.  As opposed to the purported contract with Capitol Ford where Lewis was personally to receive a $25,000 consulting fee, no rights or responsibilities were expressly reserved in his contracts with either Ford entity to his benefit or detriment.  While LFE is not a large corporation, there is no indication that Lewis is the only shareholder.  On the other hand, Lewis did personally guarantee LFE's financial obligations.  He further suggests that the dealership's demise affects his personal and business reputation as well as his ability to obtain credit.  Insofar as his breach claim seeks to redress this harm, he argues he has individual standing.

The Ninth Circuit addressed the question of an individual shareholder's standing in a factual context similar to the case at bar.  In *Sherman v. British Leyland Motors*, a dealership's president and sole shareholder brought an individual claim against an automobile manufacturer under the DDCA.  The Court held that even his personal guarantee of the corporate dealership's obligation under its franchise agreements did "not warrant departure from the general rule of separation of

---

[6] Even assuming Lewis had standing, he presents no facts in support.  Ford Credit submits a dated notice and a sales log that demonstrate at least a ten-day interim period.

identities, nor afford [him] standing to bring suit in his individual capacity." 601 F.2d 429, 439-40 (9th Cir. 1979). Here, the facts warrant application of the rule as articulated in *British Leyland*.[7]

Lewis also contends that both Ford companies breached the covenant of good faith and fair dealing implied in his franchise and financing agreements. He cites the facility upgrade Ford Motor requested in June of 2007. Lewis levies the same allegation against Ford Credit but suggests that entity breached the covenant when it sought and exercised the writ of possession with knowledge of a pending sale to Capitol Ford. For the reasons just articulated, Lewis lacks standing to enforce a covenant implied in LFE's contracts.

As to the Dealer's Day in Court Act claims, *British Leyland* again controls. 601 F.2d at 449-50. Like Lewis, the plaintiff dealer claimed the defendants conspired to "eliminate" him as a regional dealer and coerced him into the resignation of his franchise. *Id.* at 437-38. That conduct, the plaintiff argued, violated the spirit of the DDCA, which endeavors to protect dealerships from a manufacturer's bad faith termination of the franchise agreement. Interpreting the same section of the DDCA on which Lewis relies here, the Court found that where the corporation was the contracting party, only it and not the individual had standing. As with the plaintiff in *British Leyland*, Lewis does not have standing to sue under the DDCA.

### 2. Lewis' Intentional Interference with Contractual Relations Counterclaim

Next, Ford Credit and Ford Motor move for summary judgment on Lewis' counterclaim that each entity intentionally interfered with his alleged contract with Capitol Ford when agents of one or both companies alerted the dealership to LFE's financial troubles. A plaintiff who alleges the tort of intentional interference with an existing contract must demonstrate: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *CRST Van Expedited, Inc. v. Werner Enter., Inc.*, 479 F.3d 1099, 1105 (9th Cir. 2007) (*quoting Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998)).

---

[7] Moreover, Lewis has already attacked the validity of the personal guarantees in his opposition to Ford Credit's breach of contract claim. A decision that he lacks standing to bring a breach of contract claim on behalf of the corporation, therefore, does not deprive him of his ability to challenge the enforceability of the personal guarantees.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

In exchange for Ford Motor's repurchase of sixteen vehicles, Lewis released civil claims arising prior to August 16, 2007. As the alleged interference predated August 16, Lewis released this counterclaim. While Lewis contends the release fails for want of consideration, the argument lacks merit. The parties' franchise agreement contemplated Ford Motor's repurchase of certain vehicles in the event LFE resigned its franchise. The agreement conditioned repurchase on the franchisee's execution of a release.[8] Ford Motor did repurchase these vehicles (even if it technically remitted the funds to Ford Credit).

Lewis did not release Ford Credit from liability. As explained below, Lewis has posited issues of material fact as to whether the contract with Capitol Ford existed. Ford Credit acknowledges it knew of the alleged contract and readily admits it discussed the out of trust sales with Madrigal. One plausible inference is that Ford Credit innocently wished to make its continuing financial interest in the inventory plain. Lewis suggests another: Ford Credit wished to foil the asset purchase. The parties present different factual scenarios in support of these competing interpretations. As to damages, Lewis points to his $25,000 consulting fee as well as a $25,000 payment for the dealership's goodwill mentioned in the Letter. The motion for summary judgment on the intentional interference claim will be granted as to Ford Motor and denied as to Ford Credit.

3. Lewis' Intentional Interference with Prospective Economic Advantage Counterclaim

Ford Credit and Ford Motor next move to resolve at summary judgment Lewis' allegation that the companies intentionally interfered with Lewis' prospective economic advantage. The tort is similar to that discussed above but requires the claimant to prove the additional element of independently wrongful conduct. To prevail on the merits, Lewis must show: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). To satisfy the third element, the

---

[8] Lewis also suggests that the open question of the commercial reasonableness of these sales should make the release unenforceable under a theory that Lewis (possibly) did not receive the full benefit of his bargain. Insofar as Lewis challenges the reasonableness of Ford *Credit*'s resale to Ford Motor, he challenges the actions of the former, not the latter.

United States District Court
For the Northern District of California

1    plaintiff must prove that a defendant's acts were wrongful *apart* from the interference itself.  *Id.*

2          As alleged against Ford Motor, Lewis focuses on the company's alleged interference with

3    the Del Grande sale when it imposed the expensive facility upgrade.  The Del Grande negotiations

4    petered out in June of 2007.  Lewis' release discharged this claim.  As to Lewis' claim against Ford

5    Credit, the first two elements are not in dispute.  Lewis and Capitol Ford did attempt to negotiate a

6    purchase agreement and, even assuming the purchase price would not have resolved LFE's debt,

7    Lewis would have received the $25,000 consulting fee.  Ford Credit acknowledges it discussed

8    LFE's out of trust sales with Capitol Ford.  It insists its interest in the inventory explain and justify

9    this discussion regardless of motive.  Lewis has presented no credible evidence that Ford Credit's

10   communication with Capitol Ford was untrue, malicious, or otherwise independently wrongful.

11   Accordingly, the motions for summary judgment of both Ford Credit and Ford Motor are granted as

12   to this counter-claim.

13          4.  Lewis' Fraud Counterclaim

14         Ford Credit and Ford Motor also move for summary judgment on Lewis' fraud

15   counterclaim.  He argues Ford Credit misrepresented its intention to honor the ten-day redemption

16   period before it sold the vehicle inventory.  The operable theory of harm is the improper dissipation

17   of the corporation's assets, for which Lewis' standing is questionable.  Even assuming such

18   standing, Ford Credit submits that it *did* notify Lewis of its intent to sell the inventory and *did* wait

19   the requisite time period.  It submits copies of this notice and dated sales logs.  Lewis has not

20   refuted or even questioned these facts.  Because there is no question of material fact for trial, Ford

21   Credit's motion for summary judgment is granted as to Lewis' fraud claim.  As to Ford Motor,

22   Lewis argues it represented that it would "expedite the buy-sell process" with Capitol Ford and

23   encouraged him in July to direct LFE's service business to that dealership.  Regardless of how

24   plaintiff characterizes the activity which constituted fraud, Lewis released this possible claim and

25   Ford Motor's motion must be granted.

26   C.  Capitol Ford's Motion for Summary Judgment of Lewis' Counterclaims

27         Capitol Ford moves for summary judgment on Lewis' allegations of breach of contract,

28   breach of an implied covenant of good faith and fair dealing, fraud, and violation of the DDCA.

**United States District Court**
For the Northern District of California

These counterclaims are addressed separately.

    1. <u>Lewis' Breach of Contract Counterclaim</u>

      Capitol Ford seeks summary judgment on Lewis' claim that the Ford dealership breached an agreement to purchase LFE's inventory. Capitol Ford denies the existence of a contract. Both parties agree Lewis and Capitol Ford's president, Sergio Madrigal, signed a Letter on June 22, 2007. Lewis characterizes the Letter as an enforceable contract;[9] Capitol Ford insists it was an agreement to agree.[10] The parties dedicate much of their argument to a legal question: whether the contract, assuming it exists, is enforceable in its current state. There is a threshold question of whether the parties *intended* to enter into a binding contract. "[W]hether a certain or undisputed state of facts establishes a contract is one of law for the court." *Robinson & Wilson, Inc. v. Stone*, 35 Cal. App. 3d 396, 408 (1973). "On the other hand, where the *existence* and not the validity or construction of a contract or the terms thereof is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury or other trier of the facts to determine whether the contract did in fact exist. . . ." *Id.* (emphasis added). "Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily on the intention of the parties. In the absence of ambiguity this must be determined by a construction of the instrument as a whole." *Smissaert v. Chiodo*, 163 Cal. App. 2d 827, 830 (1958).

      The Letter is a one page document without a title or heading. It bears the signatures of Madrigal and Lewis. Beneath the signature line, the text reads "Acceptance Signature." Above the parties' names and signatures, the document states in bold, italicized text, "The attached offer is good till C.O.B. Friday, June 22, 2007." The Letter contains seven paragraphs: each contemplates

---

[9] In California, a contract will be enforced if it is "sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 209 (2006) (*citing Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 623 (1991)).

[10] In *Rennick v. O.P.T.I.O.N. Care, Inc.*, the Ninth Circuit reasoned that a written letter of intent is often functionally an agreement to agree. 77 F.3d 309, 315 (9th Cir. 1996) (noting that a "letter of intent" is not a legal term of art but is instead a term commonly employed, for example, in real estate documents and sales of corporate assets). A letter of intent, as conceived in *Rennick*, "refers to a writing documenting the preliminary understandings of parties who intend in the future to enter into a contract." *Id.*

**United States District Court**
For the Northern District of California

1   distinct aspects of an asset purchase.  While the Letter concludes that, in most circumstances, price

2   and quantity will be determined by later negotiation or independent appraisal, its language is not

3   necessarily precatory (it incorporates terms like "offer" and "acceptance" and never indicates its

4   terms are not binding).  The Letter mentions two payments of $25,000: one for goodwill and another

5   as a consulting fee.  These facts could support the inference that the parties intented to commit to the

6   asset purchase.  To support the opposite inference, Capitol Ford points to the more voluminous draft

7   purchase agreements exchanged by the parties in the ensuing seven weeks.  Each draft contained

8   language in bold type and capital letters eschewing binding effect until the parties settled on a final

9   pricing agreement.  Capitol Ford argues its principals were concerned with due diligence and would

10  not commit themselves without it.  It is clear Lewis submitted information reflecting the out of trust

11  debt or the writ of possession by, at the latest, August 7, 2010; Capitol Ford contends it was

12  exclusively this information that made the contract unworkable.  In light of both the Letter and the

13  parties' subsequent behavior, the question of intent is open to more than one permissible inference.

14  It is a question for a finder of fact and Capitol Ford's motion will therefore be denied.

15          2.  <u>Lewis' Breach of the Covenant of Good Faith and Fair Dealing Counterclaim</u>

16          Next, Capitol Ford moves for summary judgment of Lewis' breach of the covenant of good

17  faith and fair dealing counterclaim.  Lewis grounds his claim in contract.  Section 205 of the

18  Restatement of Contracts states that, "[e]very contract imposes upon each party a duty of good faith

19  and fair dealing in its performance and its enforcement."  "[T]he implied covenant of good faith is

20  read into contracts in order to protect the express covenants or promises of the contract, not to

21  protect some general public policy interest not directly tied to the contract's purpose."  *Carma Dev.,*

22  *Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992).  Capitol Ford insists there was no

23  binding contract between the parties and concludes that Lewis has no possible claim for a breach of

24  a concomitant covenant.  *See, e.g.*, *Racine Laramie Ltd. v. Cal. Dep't of Parks and Recreation*, 11

25  Cal. App. 4th 1026, 1031-32 (1992).  As explained in the preceding section, the existence of a

26  contract is an open question.  Lewis contends that Capitol Ford never intended to fulfill its alleged

27  contractual obligations but eked out economic benefit from the relationship nonetheless.  In support,

28  Lewis points to the service business he claims he relinquished to Capitol Ford in furtherance of their

United States District Court

For the Northern District of California

1   purported deal.  Although this exchange might have alternative explanations, these are questions of

2   fact.  Capitol Ford has not met its burden and its motion for summary judgment must be denied.

3           3.  Lewis' Fraud Counterclaim

4           Next, Capitol Ford requests summary judgment on Lewis's fraud counterclaim.  Lewis

5   suggests Capitol Ford fraudulently "induced the Lewis Parties to, among other things, (a) turn over

6   the lucrative . . . service business to [Capitol Ford] for no consideration . . . ."  (Lewis' Opp'n at

7   10:16-18.)  To prove common law fraud, a party must show (a) misrepresentation; (b) knowledge of

8   falsity (or "scienter"); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e)

9   resulting damage.  *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173 (2003).  Lewis seems to suggest

10   Capitol Ford misrepresented its intent to purchase LFE's assets and then reaped the benefits of

11   Lewis' belief in a binding agreement (namely, in the form of LFE's service business).  As evidence

12   of Capitol Ford's complicity in an alleged scheme to dismantle LFE, Lewis also highlights Ford

13   Motor's ownership interest in that dealership and the fact that Capitol Ford ultimately purchased

14   several seized vehicles at a (presumably) reduced price.  Lewis' fraud claim is somewhat

15   inconsistent with his breach theory: in the latter, he argued Madrigal earnestly intended to enter a

16   binding contract which he subsequently determined to breach and, in the former, that Madrigal did

17   not intend to perform even at the time of his promise.  Given the facts presented, it is for the fact

18   finder to determine which inference, if any, is correct.  Capitol Ford's motion therefore must be

19   denied.

20           4.  Lewis' DDCA Counterclaim

21           Finally, Capitol Ford argues it is entitled to summary judgment on Lewis' DDCA

22   counterclaim because the strictures of that Act do not apply to it.  An automotive dealer may bring

23   suit under the Act against "any automobile manufacturer" for damages sustained as a result of a

24   failure to act in good faith in terminating or canceling the franchise.  Capitol Ford insists it is not a

25   "manufacturer" under the Act.  A "manufacturer" is "any person, partnership or corporation which

26   acts for or is under the control of such manufacturer . . . ."  15 U.S.C. § 1221(a).  Lewis suggests

27   Capitol Ford was "controlled by" the manufacturer insofar as Ford Motor owned some portion of

28   the company.  Even if this were true, Capitol Ford convincingly counters that its relationship with

LFE did not relate in any form to the termination, cancellation or non-renewal of LFE's franchise. Capitol Ford was prepared to purchase LFE's vehicle and parts inventory; the proposed arrangement did not touch LFE's franchise. Summary judgment on Lewis' DDCA claim against Capitol Ford must therefore be granted.

## IV. CONCLUSION

1.  Ford Credit's motion for Summary Judgment as plaintiff: Ford Credit's motion for summary judgment of its claims for breach of the Wholesale and Capital Loan Agreements are denied. Its motion to enforce Lewis' obligation under his twin personal guarantees is also denied.

2. Ford Credit, Ford Motor, Capitol Ford's motions for summary judgment as counter-defendants:

   a.  Ford Credit and Ford Motor's motions for summary judgment on Lewis' counterclaims for breach of contract, for breach of the implied covenant of good faith and fair dealing claim, and violations under the DDCA are granted.

   b.  Ford Motor's motion for summary judgment on Lewis' counterclaim for fraud, intentional interference with contractual relations and with prospective economic advantage is granted.

   c.  Ford Credit's motion for summary judgment on Lewis' counterclaims for fraud and intentional interference with prospective economic advantage is granted. Its motion for summary judgment on Lewis' intentional interference with contractual relations is denied.

   d.  Capitol Ford's motion for summary judgment is denied on Lewis' breach of the implied covenant and fraud counterclaims but granted on his DDCA claim.

3. A Case Management Conference shall be held on **July 1, 2010 at 10:00 a.m.** in Courtroom 3 on the 17th Floor of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California. The parties shall submit a Joint Case Management Statement by June 24, 2010.

        IT IS SO ORDERED.

Dated: 05/19/2010

_____
RICHARD SEEBORG

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

_____
UNITED STATES DISTRICT JUDGE